IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA,
     Plaintiff,

v.                                 5:22-cr-79-JA-PRL

DAVID LEE BISHOP,
     Defendant.
_____/

### REPORT AND RECOMMENDATION[1]

Defendant, David Lee Bishop, an inmate at Coleman Federal Correctional Complex ("FCC Coleman"), is charged by indictment with the second-degree murder of Samuel Sampayo. (Doc. 1; Doc. 75). Notably, the government filed a notice of its intent not to seek the death penalty. (Doc. 9). A jury trial is set to commence January 8, 2024. (Doc. 49). Bishop has filed a motion to suppress three inculpatory statements he made as involuntary or violative of *Miranda*. (Docs. 46 & 70); *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). The Court held an evidentiary hearing on Bishop's motion to suppress on December 5, 2023. As discussed below, I submit that the motion to suppress should be **denied**.

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B). A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

I.    BACKGROUND

According to the indictment, Bishop killed Sampayo on February 3, 2019.

**A.  First Confession**

During a headcount on February 3rd, Sampayo's body was discovered in his and Bishop's cell. Bishop was removed from the cell in hand restraints and placed in the shower area of the unit. In the shower area, Bishop first confessed to murdering Sampayo, in response to Lt. Anthony Sierra asking him "what happen[ed]." Also present were Officers Powell and Uribe. After confessing, Bishop was taken to a holding cell.

**B.  Second Confession**

Two hours later, Bishop was taken to the Lieutenant's office,[2] where he executed a waiver of his *Miranda* rights. Bishop then confessed to killing Sampayo a second time, while questioned by Lt. Jefferey Kajander, and Special Investigative Services ("SIS") Lts. Rajesh Sharma and Kenneth Hill. After admitting to killing Sampayo, including details of his actions, Bishop stated he was done talking, but (without any prompting) continued to confess additional details of Sampayo's death and his actions afterwards. The encounter was then terminated when Bishop was done speaking.

**C.  Third Confession**

In February of 2020, Bishop signed a letter that had been written (according to him) by an attorney from the Federal Defender's office, claiming that the Federal Bureau of Investigation ("FBI") had made "repeated attempts to interview" him and assertions about

---

[2] During the evidentiary hearing, there was reference to the interview taking place in the captain's office or the lieutenant's office. The government witness testified that if the interview was in the captain's office, they would have had to walk through the lieutenant's office. For purposes of this Order, the Court refers to the lieutenant's office as the location where Bishop provided his second confession.

his conditions of confinement worsening, e.g., "my custodial status has worsened." The U.S. Marshal's Service received this letter on February 5, 2020. About a month later, on March 5, 2020, the FBI and SIS questioned Bishop. Bishop admitted that it was untrue that the FBI had contacted him before March 5th, and this was the first time he spoke with them about this case. Bishop executed a *Miranda* waiver and agreed to speak to the FBI and SIS, but refused to allow an audio recording of the interview because apparently it would be consistent with his earlier confessions. During this interview, Bishop confessed a third time to killing Sampayo, consistent with his first and second confession. Present during that interview was SIS Lt. Sharma who had been present for Bishop's second confession (on February 3, 2019) and Bishop recalled that agent from that time.

Now, Bishop has moved to suppress all three confessions. Bishop argues the first and second confessions are inadmissible because they were involuntary and violated his *Miranda* rights. Alternatively, Bishop argues that his second confession should be suppressed because his waiver of *Miranda* was not voluntary, knowing, and intelligent. Finally, Bishop argues that his third confession should be suppressed, because it was not made voluntarily, he invoked his right to have counsel, or his waiver of *Miranda* was not voluntary, knowing, and intelligent.

The motion to suppress is due to be denied, because Bishop's confessions were made voluntarily and do not violate *Miranda*.

## II.   LEGAL STANDARDS

Under the Fifth Amendment, statements made in response to government questioning by a defendant who is in custody may be used by the government if there is a voluntary, knowing, and intelligent waiver of *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 444

(1966). First, however, the defendant must "establish [that] he was in custody and the statements were made in response to government questioning." *United States v. Aldissi*, No. 8:14-CR-217-T-33EAJ, 2015 WL 1268284, at *3 (M.D. Fla. Mar. 19, 2015); *United States v. de la Fuente,* 548 F.2d 528, 533–34 (5th Cir. 1977).[3] A defendant who makes statements while incarcerated in prison is not automatically in custody. *Howes v. Fields*, 565 U.S. 499, 510–11 (2012). Instead, custody exists when, "in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he . . . was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (first quoting *Stansbury v. California*, 511 U.S. 318, 322–323, 325 (1994) (per curiam); then quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). Courts must consider "all of the circumstances surrounding the interrogation" to determine how the defendant "would have gauged his freedom of movement," including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Howes*, 565 U.S. at 509 (citations, internal quotations, and alterations omitted).

"When a defendant challenges the voluntariness of a confession, the government bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary." *United States v. Grimes*, 142 F.3d 1342, 1350 (11th Cir. 1998). "The standard for evaluating the voluntariness of a confession is whether a person 'made an independent and informed choice of his own free will, possessing the capability to do so, his will not being overborne by the

---

[3] All decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981, are binding on the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

pressures and circumstances swirling around him.'" *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362 (11th Cir. 1984) (quoting *Jurek v. Estelle*, 623 F.2d 929, 937 (5th Cir. 1980) (en banc), *cert. denied,* 450 U.S. 1001 (1981)). "Voluntariness depends on the totality of the circumstances and must be evaluated on a case-by-case basis." *Id.* Courts consider "the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police[.]" *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) (first citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); then citing *United States v. Gonzalez*, 71 F.3d 819, 828 (11th Cir. 1996)).

Defendants may waive *Miranda* rights, if done so "voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444. The government has the burden of establishing by a preponderance of the evidence that the waiver of Miranda rights was voluntary. *See United States v. Barbour*, 70 F.3d 580, 584 (11th Cir. 1995) (citing *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986)). First, the Court must decide if the waiver was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Miranda*, 384 U.S. at 421. Second, the Court must decide if the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* Courts consider the totality of the circumstances in deciding whether there was "an uncoerced choice and the requisite level of comprehension" to waive *Miranda*. *Id.*

## III.   DISCUSSION

### A.  First Confession—Shower Area on February 3, 2019

Bishop asserts that his first confession should be suppressed because it was made in violation of *Miranda* and it was involuntary.

> **1.  Bishop's first confession was not made during custodial interrogation so it did not require *Miranda* warnings**

First, Bishop asserts that his confession in the shower area is inadmissible because it was obtained in violation of *Miranda*. The government argues that Bishop's response to Lt. Sierra's question did not require *Miranda* warnings because he was neither in custody nor subject to interrogation.

*Miranda* warnings are not required "anytime a jail official questions an inmate[.]" *Garcia v. Singletary*, 13 F.3d 1487, 1491 (quoting *Cervantes v. Walker*, 589 F.2d 424, 428 (9th Cir. 1978)). Instead, the inmate must "show that [the] jail official's actions in some manner 'place[d] further limitations on' him." *Garcia*, 13 F.3d at 1491 (quoting *Cervantes*, 589 F.2d at 428 (alterations in original); *see Howes*, 565 U.S. at 508–17 (questioning a prisoner, even in isolation from general prison population, does not necessarily require *Miranda* warnings, depending on all features of interrogation). Notably, "on-the-scene questioning as to facts surrounding a crime or other general questioning . . . in the fact-finding process," does not amount to "interrogation within the meaning of *Miranda*." *Miranda*, 384 U.S. at 477; *Garcia*, 13 F.3d at 1491–92 (quoting *Cervantes*, 589 F.2d at 429; citing *United States v. Scalf*, 725 F.2d 1272, 1276 (10th Cir. 1984)).

Here, under the totality of the circumstances, Bishop was not in custody for purposes of *Miranda*. *Garcia*, 13 F.3d at 1492 ("In the context of questioning conducted in a prison . . . [an inmate is in custody when there is] . . . 'a change in the surroundings of the prisoner which

results in an added imposition on his freedom of movement.'") (quoting *Cervantes*, 589 F.2d at 428). First, the government asserts that Bishop was familiar place during the encounter—the shower area of the unit he was housed—going against a finding of custody. *United States v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006). Second, Lt. Sierra only asked Bishop "what happen[ed]" during the encounter, and after Bishop confessed in response, the encounter was terminated. Third, while Bishop was in hand restraints (and in the locked shower area) during the encounter, Lt. Sierra testified that this was standard operating procedure in emergencies. *See United States v. Conley*, 779 F.2d 970, 973–74 (4th Cir. 1985), *cert. denied*, 479 U.S. 830 (1986) ("Although Conley wore handcuffs and, at some points, full restraints, evidence in the record indicates that this was standard procedure for transferring inmates to the infirmary or elsewhere in this maximum security facility") (emphasis added).[4] Fourth, Bishop was escorted to the shower area in hand restraints, but not by Lt. Sierra.

Fifth, Lt. Sierra testified that the purpose of the encounter was to figure out what happened, rather than to question Bishop as a suspect, as it was unclear what happened to Sampayo at the time. *See id.* (questioning inmate as witness rather than suspect goes against a finding of custody). Indeed, Lt. Sierra testified that he was not aware that Sampayo was even deceased at the time. Sixth, Lt. Sierra testified that he had met Bishop before, and that this was not his first encounter with Bishop. *Id.* (law enforcement officer knowing inmate before encounter goes against finding of custody). Although there were three prison officials present in the shower area, only Lt. Sierra asked Bishop "what happen[ed]." Finally, Bishop was removed from his cell because, as Lt. Sierra testified, the cellmate of someone who is

---

[4] The Eleventh Circuit adopted the reasoning of *Conley* (and *Cervantes*) as "highly persuasive" in *Garcia*. *Garcia*, 13 F.3d at 1491 (first citing *Cervantes*, 589 F.2d at 428–29; then citing *Conley*, 779 F.2d at 973–74).

unresponsive will be moved somewhere, like a shower area, so that officers can respond to an emergency and provide any necessary medical assistance. *Garcia*, 13 F.3d at 1492.

Further, Lt. Sierra asking Bishop "what happen[ed]" is "on-the-scene questioning" that does not amount to an interrogation requiring *Miranda* warnings. As in *Garcia*, under the facts of this case, it appears that Lt. Sierra's "question was a spontaneous reaction to a startling event." *Garcia*, 13 F.3d at 1491. Lt. Sierra testified that he asked Bishop "what happen[ed]" to literally determine what happened to Sampayo immediately after his body was found. (Docs. 46 at ¶ 7; 46-1 at 2; 58 at 2); *see Garcia*, 13 F.3d at 1491–42. Bishop confessed in response that: "I strangled my cellmate . . . to death with a piece of cloth made to a rope and then I flushed [it] down the toilet. I hope you guy's [sic] kill me of [sic] this. I want the death row. I hate this . . . and I am tired of doing time." (Docs. 46 at ¶ 8; 46-1 at 2; 58 at 2). Lt. Sierra testified that he did not know that Sampayo was dead at the time, and only knew that there was an unresponsive inmate when he went to the L-1 Unit. Finally, Lt. Sierra's question seems appropriate under the circumstances as he testified that he was "charged with the care and safety of all of the inmates, . . . [and] acted within the scope of his authority to ensure the safety of [Bishop] and the other inmates." *Garcia*, 13 F.3d at 1492.

Accordingly, Bishop's first confession did not require *Miranda* warnings, because it was made in response to on-the-scene questioning, and Bishop was not subject to more than the usual restraint on a prisoner's freedom of action.

### 2. Bishop's first confession was not involuntary or unreliable due to his drug use, emotion, or mental health history

Additionally, Bishop argues that his first confession was involuntary due to his mental health history, drug use, or outward emotion after being questioned. Bishop asserts that he:

> "has a long history of various mental disorders, beginning with hyperactivity and impulsive behavior as a youth. Bishop's first psychiatric hospitalization was in 1992 while he was serving in the United States Army. At that time, Bishop was diagnosed with "bipolar disorder with psychotic features" and "schizotypal personality disorder." Following his discharge from the Army, Bishop was hospitalized on numerous occasions, both voluntarily and involuntarily. Throughout this time, Bishop exhibited suicidal tendencies and engaged in severe substance abuse. In November 1994, Bishop became a patient at the Veterans Administration Medical Center (VAMC) in Battle Creek, Michigan, following his commitment by the Northville Regional Psychiatric Center …"

(Doc. 46 at ¶ 4) (quoting *United States v. David Lee Bishop*, 149 F.3d 1185 (6th Cir. 1998)). Bishop claims that he used Suboxone and K-2 after Sampayo's death and before his confessions on February 3, 2019.

"[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Indeed, "a defendant's mental condition, by itself and apart from its relation to official coercion, [does not] dispose of the inquiry into constitutional voluntariness." *Id.* at 164; *see United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995). Here, it does not appear that Lt. Sierra took advantage of Bishop's mental illness. As Bishop's motion notes, he did not become emotional and tearful until after his confession. There is no mention of Bishop's mental illness in Lt. Sierra's memorandum regarding the incident. Further, Lt. Sierra testified that Bishop responded coherently to his question. *Barbour*, 70 F.3d at 585–86. Further, Lt. Sierra testified that he nor anyone else yelled at Bishop, threatened him, or brandished a weapon. Moreover, Bishop offered his statement in response to Lt. Sierra simply asking him what happened, as Lt. Sierra tried to determine whether there was an ongoing emergency. "Absent any evidence of psychological

or physical coercion on the part of the [prison officials], there is no basis for declaring [Bishop's] statements . . . involuntary." *Barbour*, 70 F.3d at 585.[5]

Further, the "mere fact that a defendant had taken drugs prior to giving a statement does not render it inadmissible." *United States v. Taylor*, 508 F.2d 761, 763 (5th Cir. 1975). "The evidence must show the defendant was so affected as to make his statement, after appropriate warnings, unreliable or involuntary." *Id.* Here, it does not appear that Bishop was so affected by K-2 or suboxone that his statement was unreliable or involuntary. As the government contends, Bishop's first confession was consistent with his two subsequent confessions. (Docs. 46-1 at 2; 46-2 at 1, 5; 46-3 at 3, 9; 70-1 at 3). Likewise, Lt. Sierra testified that Bishop did not appear intoxicated, that Bishop did not slur his speech, and that Bishop responded coherently to Lt. Sierra's question. *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003) ("Multiple witnesses testified that while [defendant had] . . . odor of alcohol about him, he did not appear to be intoxicated or suffering from delirium tremens at the time he" gave statements); *see also United States v. Djenasevic*, 545 F. App'x 946, 949 (11th Cir. 2013) (*Miranda* waiver neither involuntary nor unreliable when government agent "testified that [defendant] was 'alert and responsive' after his arrest and showed no signs of heroin withdrawal for several hours."). Finally, as the FBI statement regarding Bishop's third confession details, Bishop remembered Lt. Sharma from his second interview (and confession) that day which was two hours after his first. (Doc. 70-1 at 2; Doc. 46-2 at 5).

Accordingly, it appears that Bishop's first confession is voluntary and reliable.

---

[5] Unlike *Barbour*, Bishop does not claim that there was a promise from Lt. Sierra that he would receive medical assistance. 70 F.3d at 585.

10

### B. Second Confession—Lt.'s Office on February 3, 2019

Next, Bishop argues that the second confession he gave two hours later was a violation of *Miranda*, that he did not intelligently and voluntarily waive his *Miranda* rights, and that it was not voluntarily made.

#### 1. There was no deliberate two-step interrogation to circumvent *Miranda*

First, Bishop argues that his second confession on February 3, 2019, given two hours after his first, violated *Miranda*, because law enforcement engaged in a deliberate two-step interrogation to get him to confess without *Miranda* warnings and then had him repeat his confession after being advised of his rights. *See Missouri v. Seibert*, 542 U.S. 600 (2004).

As previously discussed, Bishop's first confession did not require *Miranda* warnings, because he was neither in custody nor subject to interrogation at that time. Hence, law enforcement did not engage in a two-step interrogation.

#### 2. Bishop's second confession was voluntary and reliable

Like with his first confession, Bishop argues his second should be suppressed because it is unreliable or involuntary due to his mental health history and drug use on February 3, 2019.[6] Here, there is no evidence of coercion due to his mental health history in eliciting his second confession. Bishop's mental health was only implicated to the extent that at the end of the interview, he "was asked if he needed to talk to psychology services but said 'no.'" (Doc. 46-2 at 6); *cf. Barbour*, 70 F.3d at 585 (finding voluntary *Miranda* waiver despite promise to defendant that he would receive psychological help for known mental health conditions). Moreover, Lt. Kajander testified that Bishop had no issue recollecting what he was talking

---

[6] Bishop does not argue that he was tearful and emotional in his subsequent questioning. (Doc. 46 at 9).

about and did not respond to any questions that he did not remember what happened. Also, Lt. Kajander testified that Bishop was seated by himself without other people surrounding him, and there were no constraints or anything that would have caused Bishop pain.

Further, Lt. Kajander testified that Bishop was calm, spoke matter-of-factly, did not appear to be in any mental distress, and gave clear and concise responses to the few questions that were asked. Likewise, Lt. Kajander testified that there were no signs that Bishop was under the influence of drugs. *Hubbard*, 317 F.3d at 1253 ("Multiple witnesses testified that while [defendant had] . . . odor of alcohol about him, he did not appear to be intoxicated or suffering from delirium tremens at the time he" gave statements); *see also Djenasevic*, 545 F. App'x at 949 (*Miranda* waiver neither involuntary nor unreliable when government agent "testified that [defendant] was 'alert and responsive' after his arrest and showed no signs of heroin withdrawal for several hours."). While Bishop was in a holding cell for about two hours before his second confession, he had space to move around and a sink and a toilet so that he could use the bathroom.

Like the first confession, there were three prison officials present for the second. Notably, over a year later, Bishop remembered one of the officials—Lt. Sharma—when he confessed a third time to the FBI and SIS. (Doc. 70-1 at 2; Doc. 46-2 at 5); *see United States v. Smith*, 608 F.2d 1011, 1012–13 (4th Cir. 1979) (finding statements admissible despite defendant drinking "enormous quantities of alcohol" twenty-four hours before his confession, because "he was sober enough to know where he was and to recognize who the people around him were"). Also, Lt. Kajander testified that Bishop did not have problems recollecting what he was talking about, and he did not hesitate. Finally, despite Bishop stating "I'm done

12

talking[,]' [he] . . . continued to talk without any questions being asked of him." (Doc. 46-2 at 6).[7] Thus, Bishop's second confession was voluntary and reliable.

### 3. Bishop's *Miranda* waiver was knowing, voluntary, and intelligent

Next, Bishop argues that his second confession is inadmissible because his waiver of *Miranda* was not made "knowingly, intelligently, and voluntarily." (Doc. 46 at 8). Here, the interview began with an investigator asking Bishop if he was willing to talk, which he said he would. (Doc. 46-2 at 5). Lt. Hill advised Bishop of his rights before the interview was conducted. (Doc. 46-2 at 4–5). Bishop "was read his *Miranda* rights and was allowed to read this [sic] *Miranda* rights." (Doc. 46-2 at 5). "Bishop stated that he could read and could read [sic] English." *Id.* "After being read this [sic] *Miranda* rights and reading his *Miranda* rights, Bishop agreed to be interview[ed] and answer this investigator's questions." *Id.* "Bishop initialed and signed the *Miranda* rights form."[8] (Doc. 46-2 at 4–5).

Notably, the form states at the bottom "**Waiver of Rights**" and contains a paragraph stating that Bishop acknowledges that he has read or been read the "Statement of Rights" contained therein. (Doc. 46-2 at 4). The last sentence of that waiver, which Bishop's signature appears immediately after, states "My signature below signifies that I am waiving these rights knowingly and voluntarily, of my own free will." *Id.* Lt. Hill and Lt. Sharma's names and signatures appear are on the form as witnesses. *Id.*

Here, there is no argument that Bishop was not advised of a right he had under *Miranda*. Bishop initialed next to form separate rights that appeared as bullet points. Bishop

---

[7] Notably, Lt. Kajander testified that he was typing his memorandum of interview while Bishop was talking, and that to catch-up with Bishop, he had to stop Bishop several times while he was speaking.
[8] Bishop initialed the form five times and signed it at the bottom. (Doc. 46-2 at 4).

stated that he could read English, and was also read his *Miranda* rights, which appeared on the waiver in English.

Further, it does not appear that Bishop's intelligence or understanding was impacted by his alleged drug use or mental health history. As stated above, Lt. Kajander testified that Bishop was calm, spoke matter-of-factly, did not appear to be in any mental distress, and gave clear and concise responses to the few questions that were asked. Likewise, Lt. Kajander testified that there were no signs that Bishop was under the influence of drugs. *Hubbard*, 317 F.3d at 1253 ("Multiple witnesses testified that while [defendant had] . . . odor of alcohol about him, he did not appear to be intoxicated or suffering from delirium tremens at the time he" gave statements); *see also Djenasevic*, 545 F. App'x at 949 (*Miranda* waiver neither involuntary nor unreliable when government agent "testified that [defendant] was 'alert and responsive' after his arrest and showed no signs of heroin withdrawal for several hours."). Moreover, Bishop remembered one of the officials—Lt. Sharma—when he confessed a third time to the FBI and SIS. (Doc. 70-1 at 2; Doc. 46-2 at 5); *see Smith*, 608 F.2d at 1012–13 ("test of whether a person is too affected by alcohol or other drugs [to] voluntarily and intelligently . . . waive his rights is one of coherence, of an understanding of what is happening," and finding statements admissible despite defendant drinking "enormous quantities of alcohol" twenty four hours before his confession, because "he was sober enough to know where he was and to recognize who the people around him were").

Additionally, Bishop was asked whether he wanted to speak, said yes, and signed the waiver that stated "[n]o promises of any kind had been made to him, "and no pressure or coercion of any kind has been used against [him] to get [him] to waive [his] rights." (Doc. 46-2 at 4). Finally, although Bishop stated "I'm done talking[,]" he continued to speak without

14

any questions being asked. *See Jacobs v. Singletary*, 952 F.2d 1282, 1295 (11th Cir. 1992) (finding defendant's statements voluntary when she "initiated" dialogue with law enforcement by "clearly signal[ing] that she wished to discuss her case" and received a *Miranda* warning one hour before conversation).[9]

Thus, Bishop's waiver of *Miranda* was knowing, voluntary, and intelligent.

### C. Third Confession—FBI and SIS on March 5, 2020

Bishop argues that his third confession, over a year later, to the FBI and SIS violated his right to have an attorney present during questioning, that he did not knowingly or voluntarily waive his *Miranda* rights, and that the confession was involuntary.

### 1. Bishop's February 2020 letter was insufficient to invoke his right to counsel on March 5, 2020

First, Bishop did not invoke his right to have an attorney present on March 5, 2020, because it cannot be anticipatorily invoked.[10] Bishop claims that he invoked this right by signing and sending a letter to the U.S. Marshal in February 2020, to "request the assistance of an attorney to protect [his] Miranda [sic] rights and other constitutional rights." (Doc. 70-2 at 2). However, during the hearing, defense counsel agreed with the government that "*Miranda* rights may be invoked only during custodial interrogation or when interrogation is

---

[9] Here, Lt. Kajander testified that the interview was terminated when Bishop finished speaking. However, to the extent Bishop would argue that he invoked his right to silence, he voluntarily waived this right by continuing to speak, indicating his "willingness to pursue an extended dialogue on the subject." *Jacobs*, 952 F.2d at 1295.

[10] Likewise, Bishop did not invoke his right to remain silent on March 5, 2020, by stating on February 3, 2019, that he was "done talking." As discussed, Bishop continuing to speak unprompted after this statement, showing he voluntarily waived that right. *Jacobs*, 952 F.2d at 1295. Further, the year break between these interviews, and the administration of fresh *Miranda* warnings shows a waiver of Bishop's right to remain silent. *Jacobs*, 952 F.2d at 1296 (finding waiver of right to remain silent where defendant "enjoyed a significant, uninterrupted period of time since her prior interrogation. . . . [she had] another opportunity to invoke her right to silence by administering fresh *Miranda* warnings. She waived her right to remain silent and then immediately gave an unsolicited description of the murders.")

imminent." *United States v. Grimes*, 142 F.3d 1342, 1348 (11th Cir. 1998); *Bobby v. Dixon*, 565 U.S. 23, 27–28 (2011) (the Supreme Court has "never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation.'") (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991); citing *Montejo v. Louisiana*, 556 U.S. 778, 795 (2009)). Accordingly, the letter, sent in February, was insufficient to invoke Bishop's right to counsel on March 5th. *See Bobby*, 565 U.S. at 27–28 (refusing to speak to police in interrogation five days before subsequent interrogation did not invoke *Miranda* rights in subsequent interrogation).

In the hearing, while defense counsel agreed that the right to counsel cannot be anticipatory invoked, they argued, Bishop invoked the right to counsel on March 5th, when the FBI and SIS confirmed that he had signed the February letter. To make such an invocation, "the suspect must unambiguously request counsel," meaning that "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). Bishop did not state that he wanted an attorney or needed one. Him confirming that he signed the letters prepared by an attorney is not the same as him making a statement that could be reasonably construed as an expression of a desire for the assistance of an attorney.

Moreover, it cuts against Bishop's argument that he invoked the right to assistance of counsel, as when he confirmed he signed that letter, he was reminded of his right to counsel, yet did not request one at that time. Further, after discussing the February letter,[11] Bishop

---

[11] SA O'Connor testified that the February 5th letter prompted him to contact Bishop, as the letter asserted that the FBI had attempted to contact Bishop multiple times, but SA O'Connor, as lead

"was asked if he would be willing to speak with" the FBI and SIS "without an attorney present." (Doc. 70-1 at 2). "Bishop agreed to speak [to them] . . . without an attorney present." *Id.* Likewise, the Advice of Rights form that Bishop signed, states under the consent portion (and right above Bishop's signature) that: "[a]t this time, I am willing to answer questions without a lawyer present." (Doc. 70-1 at 5). Finally, Special Agent ("SA") O'Connor testified that before and after signing the Advice of Rights, Bishop did not say anything about having an attorney present or discontinuing the interview.

Hence, Bishop did not invoke his *Miranda* right to counsel on March 5th.[12]

### 2. Bishop's *Miranda* waiver was knowing, voluntary, and intelligent

Second, Bishop's waiver of *Miranda* rights on March 5th was knowing, voluntary, and intelligent. After agreeing to speak to the FBI and SIS, Bishop was "advised of his rights under *Miranda* via the FBI FD-395 'Advice of Rights' form." (Doc. 70-1 at 2). SA O'Connor testified that he read that form aloud to Bishop, then presented it to Bishop to read and sign. Bishop signed the form's consent portion. *Id.*

Unlike the earlier waiver Bishop gave, he was not asked whether he could read English. However, Bishop was read the form by SA O'Connor. Moreover, although the defense argues that Bishop did not initial next to each right, unlike the earlier waiver, the FBI form does not have blank spaces for the suspect's initials. (Doc. 70-1 at 5). Further, Bishop does not contend that he was under the influence of drugs at the time of his third confession.

___

investigator, could not find any records documenting the FBI contacting Bishop. SA O'Connor testified that after Bishop confirmed it was untrue that the FBI had contacted him before their meeting, it appeared that Bishop wanted to speak. SA O'Connor then asked if Bishop was willing to speak without an attorney present, and *Mirandized* him.

[12] Bishop's Sixth Amendment right to counsel was not invoked because it only attaches when prosecution is commenced "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *United States v. Gouveia*, 467 U.S. 180, 188 (1984) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)).

Likewise, SA O'Connor testified that there was no indication that Bishop was under the influence of any substance, and it was an open communication. Finally, SA O'Connor testified that before, during, and after the interview, no promises were made to Bishop. Likewise, SA O'Connor testified that Bishop was not subject to torture or restraints besides handcuffs.

Thus, Bishop's waiver of *Miranda* was knowing, voluntary, and intelligent.

### 3. Bishop's third confession was voluntary and reliable

Finally, Bishop argues that his third confession was involuntary, because in addition to his mental health issues, the FBI and SIS investigators knew that he wanted to change his housing, and had been in the SHU for a year.

Indeed, the FBI and SIS report details that "Bishop has long been dealing with mental health issues and could only take living with a cell mate for a certain amount of time. As a result, Bishop had many different cell mates throughout his time in prison. Bishop had not assaulted previous cell mates, and any previous altercations would have been in self-defense." (Doc. 70-1 at 3). However, SA O'Connor testified that no promises were made to Bishop, including those based on housing, because it is FBI policy and the BOP wouldn't listen to him about housing. The end of interview notes only mention Bishop's desire to return to normal inmate privileges at the end of the interview. Hence, Bishop was not coerced, promised, or induced by the FBI and SIS to confess so that he could have normal inmate privileges.

Finally, there were no promises, inducements, or coercion based on Bishop's mental health history. Despite the FBI and SIS being aware of Bishop's mental health history, it was not mentioned until the end of the interview. Notably, Bishop's mental health is only

mentioned to state that he had a consistent change of cellmates due to it. It does not appear that his mental health history was used to coerce his confession. Further, it does not appear that Bishop was promised that he would have a different cell if he confessed. *Cf. United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (finding voluntary *Miranda* waiver where defendant was promised that he would receive psychological help for known mental health conditions). Notably, Bishop declined to an audio recording of the interview because he did not think it was necessary "as he ha[d] been candid with prison staff in prior interviews." (Doc. 70-1 at 2). Indeed, Bishop's third confession is consistent with his first and second. Finally, Bishop was only in hand restraints and was in a room with space for him and the FBI and SIS investigators when he gave the third confession.

Hence, Bishop's third confession was voluntary and reliable.

## IV.   RECOMMENDATION

Accordingly, it is recommended that Bishop's motion to suppress (Docs. 46 & 70), be **denied**.

Recommended in Ocala, Florida, on December 11, 2023.

PHILIP R. LAMMENS
United States Magistrate Judge

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy